Good morning. May it please the court, Oliver Dunford, pro bono counsel for the appellants in this case, individuals, groups, and two counties in California. Okay, are you pro bono appointed by us or pro bono? Pro bono by by us. By you? By me. Yeah, not pro bono appointed by the court. Correct. Okay. We have some representatives in the courtroom. Yeah. My clients challenge the Forest Services travel management in this decision, its decision in this case, but I want to direct the court to what this case is not about. My clients are not demanding more miles in the forest, not demanding more routes in the forest, nor are they asking for veto power over the Forest Services decision. Rather, what this case is about is whether the Forest Service must, in a case like this in which there's such significant impacts, whether the Forest Service must truly coordinate and cooperate with the counties, and whether they must consider a reasonable range of alternatives as they make their decision. Because they failed to do that in this case, the Forest Service failed to meet NEPA's twin goals of informed decision-making and informed public participation. And we'd ask the court to set aside the Forest Services decision in this case and demand for a proper NEPA analysis. I agree with you that coordination is a key issue. What specifically should the agency have done to coordinate with the local entities? You're not suggesting that the agency must grant the wishes of the community. They met with members of the community. What more should they have done? Yes. The Forest Service met with the counties and other individuals. And as it said in its brief, it did so with all interested parties. But the travel management rule itself requires more for the counties that are required to coordinate. And to answer your question directly, coordination means harmonization, as we explained in our briefs. And we think that means that when there are different alternatives available, one of which would be consistent with both the service's goals and with the county's goals, and one of which may be inconsistent with the county's goals, we think that the service has an obligation to use the former and to use an alternative to designate routes that would meet both the goals of the Forest Service and the goals of the counties. Can you give me an example? Yes. In particular, the counties, their broad concern was to have a continued integrated road system, beginning outside, inside, to be able to travel in and through the forest. And in particular, one particular reason is for emergency services. And in response to a comment about the closure of many of the routes, the service said that the emergency fire departments could use any routes that were available. But, of course, since many were closed, they were – it was illegal to maintain them. So they could use them if they were still open, but they had hoped they would be open. And the service further said that if any routes had become overgrown, then they could just bulldoze through them. But, of course, in an emergency situation, to require the fire departments to bulldoze through routes previously that had been used for emergency services and which can no longer be used, we think significantly impacts the county's ability to provide those services for its citizens and, frankly, for everybody. One additional concern, which relates to the fire, is that a number of routes that have been closed had been used for logging purposes and for people in the area to secure firewood to heat their homes. The inability to do that not only prevented people from heating their homes. It also allowed significantly more fuel for forest fires to remain in the forest. And so the forest fires have been worse because of the service's decision to close down routes which previously had been used. Roberts. What evidence do you have of that? Well, we have evidence that there's significantly more fuel left in the forests. But you're saying you have significantly more fuel left in the forest because people are not gathering firewood? Correct. And how much evidence do you have as to how much firewood was gathered and how much is now gathered? I don't have a specific number. That's what I thought. Yeah. No, no. Yes. Sorry, I didn't mean to. Because I understand in the abstract, the more fuel there is on the ground, the more severe the fire can be. But if you're telling me we're running serious risks of increased forest fires because of the reduced harvesting of firewood by private persons, I'm skeptical of that claim. And I'm asking how much evidence you have. And it sounds like you don't have a lot. Correct. And again, I would add the point about the closure of the routes, which prevents the fire departments from getting to fire. That's a different question. Yes. No, I understand. But I think they both go to that question. I interject a question about that. I'm looking at a Board of Supervisors document, I think you all put in. It's the FER001, it's March 10, 2009. Did you put that in? FER, yes, we did, I believe. All right. Anyway, I'm looking at ER199. Yes. And it says, there are two comments on that page with the fire service response. Okay. Closing roads makes quick response to fires by ground impossible. And as we all know, quick control of fires is a must to stop major fires. The response is, fire personnel will be able to use any road, trail, or unauthorized route they need for fire access. Okay, and then there's an extra letter 14 below that, and is a long comment. And the response is, firefighters can use any route that is available. Once they are decommissioned or overgrown, they would need to use their own route to gain access to these areas. Now, why doesn't that indicate that they considered and explained their decision? Well, I agree that it shows that they considered that, but I disagree that it shows coordination because again, there were alternatives that were available that would have been consistent with both the service's goals and the county's goals of a more interconnected route system within the forest. And where's the evidence of that? Well, the evidence is that the part of this, and this goes to our claim on the reasonable range of alternatives. The service in this case had originally, there were 1,100 miles of documented routes that were considered for final designation. The service winnowed that down to 400 miles or so, but we believe that process was improper, and the reason we say that is based on the evidence in the first and second cut spreadsheets, which shows how the service winnowed down from the 1,100 to the 400 miles, and among the routes that the service did not give detailed review to were things like dead-end spurs and routes that were off county roads. A dead-end spur, think of a cul-de-sac, but the service itself recognized that many dispersed recreation activities depend on motor vehicle access to these spurs, and that the closure of these routes would preclude public access. And on these first and second cut spreadsheets, you'll see that many of the routes, the service looked at the benefits and the access of the routes, and also considered the concerns and risks of continuing the use of those routes. But with respect to the dead-end spurs and the off county roads and things like that, no such analysis was done. And so in those cases, not only did the service not consider whether those dead-end spurs and off county roads would have provided the dispersed recreational opportunities for which the service undertook this analysis, but the service also didn't consider whether the use of those spurs would have lessened the environmental impacts. And so, again, we don't suggest that the service should have necessarily selected more routes or more miles, but the winnowing process to get from the 1,100 miles down to the 400 summarily removed from the detailed analysis a number of more environmental benefits than the routes they selected. Council, I'm not following. You started out saying there was fire hazard and access. Now you're talking about recreation and environmental benefits. What put before the Forest Service the issue of fire safety and access? You've not answered my question as far as I can tell. I don't see the link between what I read and access for fire safety. Well, we believe that the Forest Service closed too many routes that prevented sufficient interconnectedness of the routes. And so, to the record, the part of the record that you pointed to where the service said that the fire departments could use any routes that were available, that's true, but again, the counties were prevented from maintaining those routes because they had been de-designated for motor vehicle use, and as they become overgrown, access to those routes becomes much more difficult and the fire departments would need to doze through those routes in the case of an emergency. And so, we believe that had there been more coordination with the counties, the services coordination with the counties, those kinds of problems could have been alleviated. I would like to point out that in this case, the winnowing process down from the number of trails were removed from detailed analysis, which could have allowed both additional recreation opportunities and lessened environmental impact, and we believe that those additional routes should have been considered or additional plans within the forest should have been considered, and because there were additional routes, the analysis, we believe, was inadequate. Unless there are any questions right now, I'm going to reserve my time. Thank you. May it please the court. My name is Brian Toth from the Department of Justice, and I represent the defendants' appellees, United States Forest, et al. The district court correctly held that the Forest Service, when designating motorized routes for motorized recreation on the Plumas National Forest, complied with NEPA and the 2005 Travel Management Rule, both by considering a reasonable range of alternatives and by satisfying its obligations to coordinate and cooperate with the counties. Now, I'd like to start with what Judge Nelson identified as a key concern or obligation with the counties. My friend suggests that coordination has to have some substantive meaning, but that's really never been the case in any of the environmental decisions where this court has interpreted a word coordinate in a statute or regulation. It's always been understood to have a procedural meaning, and this is the case here as well, but it's demonstrated that coordination is a procedural obligation both by the text of the regulation itself and by the preamble to the 2005 rule. Now, this regulation merely says that the responsible official shall coordinate with the local government entities when making the designations. It doesn't say it has to coordinate with the goal of making them consistent or that it has to choose a particular outcome here. It leaves coordinate to the agency to define or to this court to apply a simple understanding of the term. It's not a legal term of part. Ginsburg. In page 30 of your brief, you said coordination means to be meaningfully engaged in the administrative process. Where do we get this definition? So that the Department of Agriculture's in deciding the administrative appeal here identified the term coordinate and then although said, well, it's not defined, but here's everything that was done and then listed all the different ways that the Forest Service coordinated with the counties here, including providing opportunities for public comment and just as long as well as with the rest of the public. In addition, it also met separately with county representatives, board of supervisors, members, and a number of occasions. I realize that there were several meetings. Did the service reject every suggestion of every county before making a final decision? I understand they listened. Did they accept anything? Yes, they did. I mean, one example in particular, they did accept the suggestion to designate as part of this decision a redesignation of roads. This isn't the trails. These are roads where previously they were limited to passenger vehicles. They redesignated four miles of roads so that they could be used both by passenger vehicles and by off-highway vehicles at the same time. Now, the counties wanted more miles to be redesignated, but the Forest Service explained that to do so, it would have to conduct engineering and safety studies because, after all, they're allowing off-highway vehicles, which are not typically street legal, to share the road with ordinary passenger vehicles. But that was an example where they took one of the suggestions and did, in fact, make a substantive modification to their decision as a result. So to focus in particular on this narrowing process, I think my friend has it wrong when he suggests that the court has to start for the touchstone of reasonableness with the 1,100 miles of unauthorized routes. Those were user-created routes. And the more proper focus when determining the reasonableness of alternatives and whether different combinations of routes should have been added to what the Forest Service considered in detail is the number of authorized routes that were previously on the forest. And that is previously 130 miles. This decision more than doubled it to by adding 234 additional miles of routes to the official transportation network. And the reason that the 130 is the starting point for understanding the reasonableness of what the Forest Service did is because the rule specifies that you don't have to go and inventory all the unauthorized routes before you do this type of designation. That's made clear in the preamble to the rule at a couple points. I'll provide the record citations. It's the supplemental excerpts of Record 101 and 111. They're Federal Register pages 68,269 and 68,279 of the Federal Register Notice for the final rule. And it specifically says that the Forest Service need not inventory the routes before it makes the designation. So what we're left with is the official bank of authorized routes before the decision process was undertaken. And so you're looking at it in terms of how many more miles the Forest Service considered instead of how many of the unauthorized routes did it winnow away. And this additionally... Counsel, could I just get a clarification? I mean, I don't want to throw you off your argument, but I'm coming back to your definition of coordinate as procedural. Let's say you coordinated with a county, counties, but a particular county, and they say, we appreciate your coordinating with us, but your proposed plan will seriously hamper our firefighting abilities in these wooded areas. So we would ask you to consider the impact on our ability to fight fires. Now, I read a response attributed to the Forest Service on that type of concern, and they explained you would be able to use the roads. Now, under the APA, the service, I would think, has a duty to explain why it made a particular decision. And it appeared in that fragment I read, I should say, that they did make an effort to explain. Under your definition of coordinate, are you saying if they had raised this concern and you just went ahead and without any response to them overrode their concern, that that would be not a violation of coordination or the APA? No, Judge Fischer, I'm not suggesting that at all. I fully agree that compliance with the regulation is justiciable and it's reviewed under the standards of the APA. So it was incumbent on the agency to provide a reasoned explanation, connecting, making a rational connection between the facts found and the conclusions made. That's the general State Farm standard of review under the APA. And we agree that compliance with the regulation is reviewable under those terms. And I do agree with that. The explanation that you cited is the evidence that the Forest Service provided as to why the concerns were not material here. The access by firefighters, by law enforcement in pursuit is the same today as it was prior to the 2005 rule, which is — Yes, but it won't be tomorrow. Or I'm saying metaphorically, it might not be in 10 years if some of those roads are overgrown, because I think the point's a valid one. If they're overgrown and your alternative to get through there is to use a bulldozer, well, thanks a lot. That's going to take a while to do. Now, I don't read the comment as saying that this is a good solution. I view this as a kind of responsible bulldozing as a recognition that that's actually going to be a problem down the road. But you can't say that the solution adopted by the Forest Service will provide the same amount of firefighting ability as the solution the counties want. I understand your reading of the record. I think maintenance was an issue before the 2005 rule. There were so many roads, unauthorized routes in the system, that they could not possibly maintain all of them. That bears upon environmental concerns, because you may have off-roaders who are using the trails to — the degradation of the environment. Or it may have concerns with trails that didn't go maintained before because there weren't enough funds for the Forest Service. And they're still not maintained today, but for a different reason. They're not designated as part of the official network. I think the solution to that is for the counties to identify routes that they believe, under their local police powers — which, you know, it's their primary responsibility to protect and police the safety of their local communities — identify the routes that they believe ought to be added as fire routes. This decision is not really — it was not really intended to be the vehicle for that type of engaged, coordinated planning process. But there certainly are options for the counties to engage the Forest Service in that type of plan. There is a provision in the regulations that allows for revisions of designations. More designations can be made. And the county can always petition under the APA for rulemaking if it feels like it can't go to the Forest Service informally and force the Forest Service to respond to its reasons on the record there. So there are other avenues to address this concern, which I recognize is important to the communities, and it's a concern as well to the Forest Service of maintaining the ability to defend nearby and intermingled communities on these national forests from the risk of catastrophic wildfires. So it is an obligation that the Forest Service takes seriously. Unless the Court has any further questions. No. Thank you very much. Thank you. Thank you. Just a few points. With respect to the unauthorized routes, my friend suggested there were 135 designated routes, which is true. But previous to the travel management designation here, all of the 1,100 miles were lawfully used, even though they hadn't been designated yet. The designation process is something that began in 2005 with the travel management rule. Were they maintained? To some extent. That depends on who was using them and when. So it wasn't – I don't know that all of them were – Any maintained by the counties? Yes. I believe so, yeah. And the government is right that NEPA does not address the substantive result of the Forest Service's decision here. But two points. First, we believe that the substantive result is evidence of whether or not the Forest Service truly coordinated with the counties, that the lack of coordination is shown in the final result. And we'd also point to Bennett v. Speer, where the United States Supreme Court said that discretion as to the substance of the ultimate decision does not confer discretion to ignore the procedural requirements of the decision-making. With respect to the Service's comment that it took into consideration the counties' ideas, counsel mentioned that they added four miles. Again, the forest has 1,100 miles of routes in this case, and they added four miles after the counties' suggestion. And yes, it's true that in the future the counties can petition, and the Service said in its brief – some of the examples it gave on page 29 of its brief as examples of coordination were actually communications that happened after the decision had been made. And so yes, a petition can be made in the future. The Service did continue to talk to the counties after the decision had been made. But the coordination requirement exists – the obligation had to be done before the decision was made, not afterwards. And finally, again, the purpose of this designation was to provide dispersed recreational alternatives. And the NEPA process, again, we believe the winnowing process improperly failed to take that into consideration, which may have limited the environmental impacts of the final decision. And with that, thank you very much. Thank you. Thank both sides for their helpful arguments. Granite versus U.S. Department of Agriculture is submitted. And that completes our argument for today. Thank you very much.
judges: D.W. Nelson, W. Fletcher, Fisher